Filed 6/28/21  In re Z.F. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re Z.F. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>A.F.,<br><br>    Defendant and Appellant. | G059851<br><br>(Super. Ct. Nos. 18DP0311, 18DP0312)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Mary Kreber Varipapa, Judge.  Affirmed.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minor.

\*        \*        \*

In May 2018, N.F. and Z.F. (the children) were removed from their father's custody due to physical abuse. They were 11 and 13 years old, respectively, at the time. After their removal, the father engaged in reunification services, and both he and the children participated in individual and conjoint therapy. Though there were setbacks along the way, the children were returned to their father's custody after 18 months of family reunification services. Then, after further improvement in the relationship between the father and the children, the juvenile court terminated this dependency case after a year of family maintenance.

This appeal was brought by the children's mother, who has lived in Florida since 2012 and had little contact with the children until the initiation of this dependency case. She makes two challenges on appeal, which we find unpersuasive. First, she contends the juvenile court erred by terminating the dependency proceeding. But she has not met her heavy burden on appeal. She has failed to show that the undisputed facts compel a finding that termination was improper. Rather, the record shows that when this case was terminated, the children were happy living with their father, no abuse was occurring, and he was providing for their needs.

Second, the mother asserts the juvenile court's order granting her visitation is improper because it allows the children too much discretion to determine when visitation will occur. We find no error. A court cannot grant a child discretion to decide whether *any* visitation will occur, but that did not occur here. The court ordered a minimum of one call per week and one in-person visit per month when the parties are in the same geographic area. While it gave the children discretion to increase the number of calls per week and to provide input as to the details of the in-person visits, this was not an improper delegation of authority.

For these reasons, we affirm the juvenile court's order.

2

# I

# FACTS

## A. *Removal of Children*

The facts in this section are taken from our prior opinion in this case, *In re Z.F. et al.* (Oct. 18, 2018, G056349) [nonpub. opn.].

"N.F. is 11 years old and Z.F. is 13 years old [(the children are now 14 and 16, respectively)]. An allegation of physical abuse inflicted on N.F. by the children's father, Joseph F., was substantiated. The children's mother . . . [has lived in Florida since 2012]. Z.F. told a social worker she had not seen her mother in six years. Z.F. has Type 1 diabetes and Celiac disease.

"N.F. described what happened to a social worker from the Orange County Social Services Agency (SSA): 'The child reported that on Tuesday or Wednesday of the prior week (3/20/18 or 3/21/18) his father became angry with him after waking him up for school. The child reported his father found some friendship bracelets on the bathroom floor near the plunger and believed the child was hiding them. The child stated that he had been in trouble in the past for hiding food in his room so his father does not trust him. The child stated the father called him into the bathroom and began yelling at him. The child reported that the father grabbed him by the hair to pull his head down and then punched him in the chest. The child stated that he didn't really feel any pain at the time because he was more scared and sad. The child reported that the issue was never resolved and the father was never made aware that the child did not hide the bracelets but that they just must have fallen off the counter. The child reported that there was still a bruise on his chest and lifted his shirt to reveal a quarter sized bruise . . . .'

"The social worker also spoke with Z.F.: 'The child reported that things have been going better with her father since that last incident in November 2017. The child reported that the father has smacked her face since then but he did not leave any marks. The child reported that currently her brother is on "groundation" which means he

3

sits on the floor between the back of the couch and the wall. The child explained that he is not allowed to speak to anyone or do anything except for homework. The child reported that her brother has to sit behind the couch from morning until night every day and has been on groundation for the past 2 and a half weeks. The child reported that the father has not yet given her brother an end date. [¶] The child was asked about an incident between her brother and father the week prior. The child reported that she did not see anything as she was getting ready for school but that she heard her father yelling at her brother in the bathroom. The child reported that she did not know what was happening but that when her brother left the bathroom he was crying and "wheezing.'"

"The child abuse registry shows six prior allegations of physical abuse of the children and their half sibling by the father. One report describes an incident when the mother was pregnant with N.F.: 'The report indicated there were incidents of domestic violence between the parents on more than one occasion, while in the presence of the children. Further, Orange County Sheriff's responded to the home and found the mother had left suicidal remarks on the father's cellular phone. The mother was pregnant at the time with the child, [N.F.,] and was taken to the hospital due to pregnancy complications. Law enforcement placed the mother on a 5150 hold due to concerns regarding the mother's suicidal comments. The mother reported a history of suicidal thoughts although she denied ever being diagnosed with a mental health condition. The mother also reported a history of medication to address her mental health issues . . . .' Also, on an occasion when N.F. was in trouble at school for forging his father's signature on a permission slip, and was informed his father would be notified about the issue, N.F. began crying, stating: '"He'll choke me and he'll hit me."' It was further reported that the father would send N.F. to bed without his supper at times.

"On April 3, 2018, the juvenile court found there is a substantial danger to the physical health of the children if they are not removed from the father's custody.

"At some point thereafter, SSA made contact with the mother.  Mother said she was not aware that the father was abusing the children.  The social worker noted, however, that 'the parents have a history of domestic violence in their relationship including the father breaking the mother's nose on one occasion.'  The mother told the social worker, '"I moved when he broke my nose. That was it for me."'  During their conversation, the mother related why she did not have the children with her.  She explained 'she was going to take the father to court, but she did not have money or the resources to obtain a lawyer to fight him for the children.  The mother suggested it was not her choice for the children to live with their father,' and that the father cut off her contact with the children.

"Z.F. did make contact with her mother on her 13th birthday on social media.  Z.F. told the mother that the father had given her a black eye and that she was afraid of him.  Z.F. said the father was isolating her and N.F. from friends and family.

"The petition alleged the father was physically abusive.  It also alleged the mother failed to protect the children.  On May 22, 2018, the juvenile court found the allegations true, and the children were declared dependents of the juvenile court.  The children were ordered removed from parental custody."  (*In re Z.F.*, *supra*, G056349.)

The mother appealed this order, which we affirmed in our prior opinion. (*In re Z.F.*, *supra*, G056349.)

B.  *Family Reunification Period*

After being removed from their father's custody, the children lived with their paternal grandparents.  The father, mother, and children received services through the 18-month family reunification hearing (the 18-month FR hearing), which occurred in December 2019.  Over this period, the mother completed her services from Florida, including a parenting class, psychiatric evaluation, and individual therapy.  She also

participated in conjoint therapy with the children, but these sessions stopped after about six months for unclear reasons.

The children felt abandoned by their mother, and their relationship with her was strained. Prior to the dependency case, the last time she had visited them was in 2012. Thus, she was like a stranger to the children. After the initiation of the dependency case, the mother called them three times a week. Sometimes they engaged in conversation, but many times – especially as the 18-month FR hearing approached – the children did not want to talk. The children reported that their mother pressured them to talk to her. Likewise, they felt she pressured them to visit her and to move to Florida. Z.F. also said her mother could be pushy and would try to manipulate her.

As to the father, he largely completed his case plan services prior to the 18-month FR hearing, including a parenting class, a weekly child abuse class, individual therapy, and conjoint therapy with both children. He visited the children regularly and cared for their needs. The father also implemented new parenting and coping skills rather than resorting to physical discipline. The children noticed a difference in his ability to deal with anger and denied any physical abuse by him during unsupervised visitation. Still, they remained somewhat fearful of their father. While they loved him and believed that he loved them, they wanted to continue living with their grandparents.

Despite the positive developments, the social worker was concerned the father had not taken responsibility for the abuse that had led to SSA involvement. Prior to the 18-month FR hearing, she recommended that the father's services be terminated and that the children be permanently placed with their grandparents. The father was deflated by her recommendation. He stopped talking with the children during visitation and conjoint therapy, stopped participating in services, and stopped individual therapy. In explaining these actions to the social worker, the father said he had done everything asked of him to put his family back together yet SSA still sought to deny reunification.

6

As such, he had lost faith in the process and believed that reunification would be denied regardless of what he did.

At the 18-month FR hearing in December 2019, the juvenile court declined to follow SSA's recommendation and ordered the children to be returned to their father's custody. It found the father "appeared sincere and contrite in his recognition that his hitting, slapping, and belting the children [was] inappropriate discipline." He had apologized to his children for his conduct, which "contradict[ed] the claims that he ha[d] not taken responsibility for his actions." The court ordered family maintenance services for the father. The mother was granted enhancement services, "increased in-person visitation with the [children] on an unsupervised basis when she is in Orange County," summer vacation visits lasting at least two weeks and "regular Facetime contact on a weekly basis."

The mother initially appealed this order, but her appeal was dismissed after she abandoned it.

## C. Family Maintenance Period

### 1. The Six-Month Review

Under the case plan approved by the juvenile court for family maintenance, the father was to have conjoint therapy with the children and individual therapy to increase his communication and parenting skills. The mother was to have three phone calls a week with the children, conjoint therapy with them, and individual therapy.

The family maintenance period had a turbulent start. On February 18, 2020, SSA filed an ex parte application stating that the father had been refusing to attend therapy and that he "lack[ed] empathy and parenting skills to understand the difficulty the children [were] having after being returned to his care, and how to be supportive in this process. He blame[d] the children and [was not taking] responsibility for his behavior[]

7

the children [were] reacting to." The application was placed on calendar for March 2020 but was eventually continued several times due to the COVID-19 pandemic.

Unsurprisingly, SSA's March 2020 report stated the children were having trouble adjusting to living with their father. He was not utilizing the case plan services and had also declined to sign consents for the children's therapists to provide progress reports to SSA. N.F. was afraid of his father. He lacked appetite and began hiding food again, and his father became angry at him after finding the hidden food. Z.F. appeared sad but denied any physical abuse. The mother also expressed concerns that the father was controlling the children during her phone visits with them.

SSA's next report in May 2020 revealed additional issues. The mother had expressed a desire to have family therapy with the children, but the father had not responded to her request. The report also stated that on March 29, 2020, the mother had called the police to conduct a welfare check when the children did not answer a scheduled phone call. The children eventually picked up 12 minutes late, and it was unclear whether the welfare check occurred.

Similarly, the father's failure to respond to SSA communications led SSA to make an unannounced, police-escorted visit to the father in April 2020, to ensure the children were safe. When asked why he had not responded, the father said he had been "'busy.'" The father also disclosed to the social worker that he had been out of work since October 2019 but would not explain why he was not employed. He asked for money to make his rent and car payment and declared he was applying for unemployment insurance, CalWorks, and food stamps.

During this visit, the children appeared well cared for but were guarded in their answers. Both children denied any physical abuse – and there were no outward signs of such abuse – but they did not answer when asked whether their father was yelling at them. Still, N.F. stated "'[m]y dad is better now. He is talking to us more and

8

not hitting us, and he is nice now.'" The children were also upset that their mother had called the police when they were late to the March 29 phone call.

On May 22, 2020, the mother filed a petition for modification under Welfare and Institutions Code section 388 requesting that the children be removed from the father's custody and placed with her under family maintenance.[1] The court ordered a hearing on the petition to occur in conjunction with the six-month review hearing.

SSA's June 2020 report showed little improvement. It noted the father was still unemployed and continued to be "noncompliant with his case plan." He had not participated in individual and family therapy. Nor had he provided proof of his ability to support the children after becoming unemployed. The report also stated the father had been "noncompliant with communicating and updating" the social worker. For example, he failed to provide updated medical and dental information for the children. And he still had not signed consents for the children's therapist to coordinate with SSA.

The report further observed that children appeared to be under significant stress. Of particular concern was a video call between the children and SSA in late May. Both children "were wearing long sleeve hoodies on a very hot day. [Z.F.] appeared to have a bruise on her cheek but stated that it was a shadow from the lighting. They both appeared unhappy and under stress. The [social worker] heard the father in the background and the children's eyes would dart away from the phone as if they were watching or hearing someone. [¶] They both were guarded with answers and would look up for directions as if someone were in the room." During the call, the children stated they were upset their mother had filed the section 388 petition for custody. They did not want to live with her, and the ambiguity of their living situation was causing them stress.

The mother continued to participate in services. She had visitation three times a week but felt the children were "'guarded'" during the calls and thought the

_____

1 All further undesignated statutory references are to the Welfare and Institutions Code.

9

father was interfering with them. Though she continued with individual therapy, the children refused to attend conjoint therapy with her.

At the six-month review hearing on June 22, 2020, the court denied the mother's petition for modification and ordered the children to remain with their father.[2] But it found that termination of jurisdiction was not yet warranted and left the dependency proceeding open. The court also authorized the mother to have one weekend visit per month with the children in California and authorized travel funds up to $600 per month to facilitate the visits.

2. *The 12-Month Review*

The mother made a weekend trip to California to visit the children in July 2020. Prior to the trip, the children told SSA they did not want overnight visitation and only wanted to spend one day with her. They had not seen their mother in person for a long time and wanted to "ease back into in-person visitation." When the mother arrived, the children spent one 10-hour day with her. No overnight visitation occurred. The mother was unable to make any further trips to visit the children prior to the 12-month family maintenance hearing (12-month FM hearing).

SSA's September 2020 report showed improved circumstances between the children and their father. During SSA's visits to the family, "[t]he children appeared happy and well cared for in the father's care." The report also noted that the father had been encouraging the children to engage in conjoint therapy with their mother. But they did not want to participate, and he did not want to force them to do so. The father also divulged that the children were upset after the mother's visit in July and had been upset

---

[2] The mother contends that the juvenile court failed to rule on her section 388 petition. But the court's minute order states the section 388 petition was included in the June 22 hearing. Thus, it appears the court implicitly denied the mother's petition when it ordered that the children remain with their father. The mother filed another section 388 petition on June 22, 2020, again requesting the children be removed from their father's care and placed with her. It does not appear the court ruled on this petition.

10

after phone calls with her. Likewise, the children told SSA they did not want to be forced to participate in conjoint therapy with their mother and asked that the therapy be delayed until they were ready. They had already participated in several therapy sessions with her, which had not gone well. Among other things, the children reported that "the mother did not listen to [their] feelings and would talk over [them] and the therapist."

The children also mentioned that the phone calls with their mother were not enjoyable and that the mother's ability to talk to the children had stagnated. The children normally spent only five to 10 minutes on the phone because the mother asked basic questions and the calls were boring. Z.F. also felt the mother did not listen to her and N.F. She was also dismayed by the mother's "disparaging comments about the father" during the calls. For example, that he was "manipulating the children to not engage much with the mother," which the children denied was true.

However, in November 2020, the mother filed another section 388 petition requesting that the children be removed from their father's care and placed with her. Her request was based on a phone call she had received from Z.F, in which Z.F. was crying. The petition alleged that Z.F. and the father had been fighting and that he had been verbally abusive. Over the phone, Z.F. had described herself as "awful and a complete waste of life" and asked if she could come and live with the mother in Florida. The petition asserted that Z.F. called her mother again the next day, stating she no longer had an issue with the father and that she should not have called the mother earlier. As described by the petition, Z.F. quickly hung up the phone when the mother tried to ensure she was safe. It does not appear the court ruled on this section 388 petition, but that is immaterial to our review.

When SSA followed up with Z.F. after this phone call, there were no signs of physical abuse. Z.F. confessed "she was just having a 'typical teenage' argument with her father and she was in the wrong. She felt better and indicated she wanted to remain

11

living with her father and brother." She was also upset by the mother's claim in the section 388 petition that the father had been verbally abusive.

Despite this incident, SSA's December 2020 report showed further improvement in the father's ability to care for the children. He was looking for employment, had applied for CalWORKS benefits, and was receiving food stamps. He was "ensur[ing] that the children's needs [were] being met" and they "appeared well cared for." The children did not report any abuse or neglect. The father and Z.F. had been managing Z.F.'s diabetes well, and the father reported being in communication with Z.F.'s doctors about her medical needs. The father had provided SSA with reports showing the children's progress in therapy. He was also participating in conjoint therapy sessions with Z.F., and she reported that he had been "listen[ing] to what she ha[d] to say without interrupting when she [was] upset." Z.F. was also continuing with individual therapy.

N.F.'s individual therapist stated he was more settled in the transition back to his father's custody and that there had not been any recent conflict between N.F. and his father or sister. N.F.'s conjoint therapy with his father appeared to be going well, and N.F. stated his "father listens [during therapy] and welcomes feedback from the therapist." While N.F. was "very isolated from friends and other people," this was due to remote learning at school caused by the COVID-19 pandemic. Still, N.F. was "upbeat and happy," his grades were up, and he seemed well-adjusted. The children told SSA that they wanted the dependency case to be closed.

SSA's report also noted that the father had been encouraging the children to have a better relationship with their mother, but the relationship had not improved. The children did not want to participate in calls with the mother, and the substance of their calls was still poor. The social worker observed two calls. In the first call, the children told the mother they did not want to talk and hung up. Before the second call, which occurred a week later, the social worker encouraged the children to stay on the phone and

12

explain to their mother why they did not want to talk. When the call began, Z.F. told her mother "'their communication [was not] growing.'" N.F. said she recycled the same basic questions. When the social worker interjected and asked if they would be interested in having longer conversations if the mother asked more in-depth questions, the children said that "they did not want to have longer conversations with [her] and they 'ha[d] a wall up.'" The mother believed the children had been negatively influenced by the father not to speak with her.

Similarly, the children did not want to participate in conjoint therapy with their mother. They again explained that in prior conjoint therapy sessions, the mother "yelled at the therapists and did not listen to the children when they expressed their feelings."

SSA's final report was issued in January 2021. At the time, the father was continuing to look for employment and stated he would use savings to cover the family's monthly expenses. Individual therapy for the children was on pause due to its cost and the father's unemployment, but the father stated it would resume once he was employed again. The children believed things were going well. They were "happy living with their father, fe[lt] safe, and did not report any needs or concerns regarding residing with the father." They also denied that their father had engaged in any neglect or physical, emotional, or verbal abuse. The children still did not want to talk with their mother and described their relationship with her as broken. SSA concluded the report by recommending that the dependency proceeding be terminated, explaining "the reasons the children came to the attention of the [juvenile court] have been mitigated."

Based on SSA's recommendation, the juvenile court terminated the dependency proceeding at the 12-month FM hearing on January 20, 2021. It granted physical custody of the children to the father and legal custody to the father and mother. Its order allowed the mother to have at least one telephone or video visit per week and unlimited calls if the children desired. As to in-person visitation, when the mother was

13

local in California or the children were in Florida, the mother was awarded "a minimum of one visit per month with input of the child[ren]."

The mother appeals two aspects of the court's order. First, she argues the court erred by terminating its jurisdiction over the children. Second, she maintains the court's visitation order is improper because it allows the children too much discretion to determine when visitation will occur. We disagree with both contentions.

II

DISCUSSION

A. *Termination of Jurisdiction*

After "a child has been declared a dependent, the juvenile court must review the status of the child every six months." (*In re N.O.* (2019) 31 Cal.App.5th 899, 921-922.) "'The applicable standards at the six-month review hearing differ depending on the child's placement.'" (*Id.* at p. 922.) When the child was previously "removed from the physical custody of a parent and/or guardian and later returned to that parent and/or guardian," the hearing is governed by section 364. (*Ibid.*, italics omitted.) "At the section 364 review hearing, the juvenile court is not concerned with reunification, but in determining whether the dependency should be terminated or supervision is necessary. [Citation.] The juvenile court makes this determination based on the totality of the evidence before it, including reports of the social worker who is required to make a recommendation concerning the necessity of continued supervision." (*Id.* at pp. 922-923.)

"'Section 364, subdivision (c) establishes a *statutory presumption in favor of terminating jurisdiction* and returning the child[ren] to the parents' care without further court supervision.' [Citations.] . . . [S]ection 364(c) requires the juvenile court to 'terminate its jurisdiction unless the social worker or his or her department establishes by a preponderance of evidence that the conditions still exist which would justify initial

14

assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn.'" (*In re N.O.*, *supra*, 31 Cal.App.5th at p. 923, italics added.) When the relevant agency recommends termination of jurisdiction, "termination will be the 'default result' unless either the parent, the guardian, or the child objects and establishes by a preponderance of the evidence that conditions justifying retention of jurisdiction exist or are likely to exist if supervision is withdrawn." (*In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1163.)

At the section 364 hearing in this case, SSA recommended termination of jurisdiction, and the juvenile court found that the mother had not met her burden. She faces a significant hurdle on appeal. To prevail, she must show "'the evidence compels a finding in [her] favor . . . as a matter of law.'" (*In re Aurora P.*, *supra*, 241 Cal.App.4th at p. 1163.) "Specifically, the question becomes whether the [the mother's] evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved of on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989.) In other words, the "'undisputed facts [must] lead to [the] conclusion'" that the court erred in terminating jurisdiction over the children. (*In re Aurora P.*, *supra*, 241 Cal.App.4th at p. 1164.)

The mother has not met her burden. She "simply direct[s] us to evidence in the record that might have supported a conclusion different from that reached by the juvenile court." (*In re Aurora P.*, *supra*, 241 Cal.App.4th at p. 1164.) We need not go through her evidence in detail since the relevant portions are set forth above. However, we note that most of her evidence relates to issues raised during the 18-month period or the initial six-month period of family maintenance. This evidence is far less persuasive than the evidence from the months leading up to the 12-month FM hearing. It is unsurprising that concerns arose during this two-and-a-half year proceeding. The children were taken away from their father because he needed time to learn proper

15

parenting techniques, grow into a more responsible parent, and then rebuild his relationship with the children. This is a process in which incremental change is expected.

While concerns occurring earlier in the proceeding should not be completely ignored, they should be given less weight than more recent events showing growth and improvement in the relationship. The relevant inquiry here is whether areas of concern were alleviated over time. The evidence shows that they were. In the months leading up to the 12-month FM hearing, the relationship between the father and the children had stabilized. The children denied any physical, verbal, or emotional abuse. Their needs were being met, and they appeared well cared for. They felt happy and safe living with their father, and they stated their father was listening to them during conjoint therapy. The father was managing Z.F.'s health conditions and was communicating with SSA and providing them with necessary documents and information. Though there was potential concern relating to the November 2020 phone call that Z.F. made to her mother, Z.F. reported that it was just "a 'typical teenage' argument," she was in the wrong, and that no abuse occurred. There is no material evidence that Z.F.'s description of the call was false or made under duress. Finally, the father and the children both wanted the dependency case to be closed.

At best, the mother offered competing or conflicting evidence, which is typical in dependency cases. "'And, as is common in many dependency cases, this case obligated the juvenile court to make highly subjective evaluations about competing, not necessarily conflicting, evidence. . . . It is not our function to retry the case. We therefore decline [the mother's] implicit invitation to review the record so as to recount evidence that supports [her] position . . . with the object of reevaluating the conflicting, competing evidence and revisiting the juvenile court's failure-of-proof conclusion.' [Citation.] This is not a case 'where undisputed facts lead to only one conclusion.'" (*In re Aurora P.*, *supra*, 241 Cal.App.4th at p. 1164.)

16

*B. Visitation*

The mother also contends the court erred by allowing the children too much discretion in determining when visitation will occur. We find no error.

A juvenile court's order setting visitation is reviewed for an abuse of discretion. (*In re R.R.* (2010) 187 Cal.App.4th 1264, 1284.) "An abuse of discretion may be found only if '"no judge could have reasonably reached the challenged result. [Citation.] '[A]s long as there exists "a reasonable or even fairly debatable justification, under the law, for the action taken, such action will not be . . . set aside . . . ."'"'" (*O'Donoghue v. Superior Court* (2013) 219 Cal.App.4th 245, 269.)

"[I]n making exit orders, the juvenile court must look at the best interests of the child." (*In re John W.* (1996) 41 Cal.App.4th 961, 973.) "[T]he child's input and refusal and the possible adverse consequences if a visit is forced against the child's will are factors to be considered in administering visitation." (*In re S.H.* (2003) 111 Cal.App.4th 310, 317.) "Nonetheless, the power to decide whether *any* visitation occurs belongs to the court alone. [Citations.] When the court abdicates its discretion in that regard and permits a third party, whether social worker, therapist or the child, to determine whether any visitation will occur, the court violates the separation of powers doctrine. [Citation.] The discretion to determine whether *any* visitation occurs at all 'must remain with the court, not social workers and therapists, and certainly not with the children.'" (*Id.* at pp. 317-318, fns. omitted, second italics added; *In re A.C.* (2011) 197 Cal.App.4th 796, 799 ["'This rule of nondelegation applies to exit orders issued when dependency jurisdiction is terminated'"].)

Here, the court did not delegate discretion to the children to determine whether *any* visitation with the mother would occur. It ordered that the mother would have at least one call per week with the children and at least one in-person visit per month "with input of the child[ren]" when the parties are in the same geographic location. Since the children are teenagers, it was reasonable for the court to set a

17

minimum amount of visitation and allow them discretion to increase that amount if desired. Likewise, it was reasonable to allow the children input as to the time, place, and manner in which in-person visitation will occur. Neither of these aspects of the order was an improper delegation of the court's authority. (See *In re S.H.*, *supra*, 111 Cal.App.4th at pp. 317-318.)

Further, the court's order of one call per week was reasonable given the circumstances. The poor relationship between the children and the mother was not caused by any infrequency in the calls but by their content. The children felt their relationship with the mother had stagnated, and they complained that she did not listen and constantly repeated the same questions. In fact, the frequency of the calls appears to have been detrimental to the relationship. The children do not want to be forced to talk to their mother. On many phone calls, the children simply stated they did not want to talk and hung up. Thus, it was rational for the court to reduce the amount of the calls from three times to once a week, which will make the calls less intrusive to the teenage children. It is not unreasonable to believe that this may reduce their resentment and anxiety towards the calls, which could allow the children to feel more at ease talking to their mother and improve the relationship between the parties.

Allowing one in-person visit per month was also reasonable considering the mother has only visited the children twice since the initiation of this case in 2018.[3] The mother argues the court gave "[n]o consideration . . . to setting up a visitation schedule for summer vacation or holidays." Nothing in the order prevents the mother from scheduling her monthly visit, or having the children visit her, during either of these events. As such, we presume she is referring to an order for the children to stay overnight with her during summer vacations and certain holidays. But the record shows the children have a poor relationship with their mother and are not comfortable staying

___

[3] In addition to the mother's visit in July 2020, she also visited the children in November 2018.

overnight with her. They refused overnight visitation during her July 2020 trip. Nothing in the record shows their feelings have changed. It was reasonable for the court to conclude that forcing teenage children into overnight visitation with their mother was not in the best interests of the children or their relationship with the mother. (See *In re John W.*, *supra*, 41 Cal.App.4th at p. 973; *In re S.H.*, *supra*, 111 Cal.App.4th at pp. 317-318.)

The mother also asserts that she will be unable to contact her children if the father disappears, as she maintains he has done in the past. It is unclear how increased phone or in-person visitation would alleviate this concern. Regardless, the juvenile court also ruled that "[i]f the mother provides cellphone and service to the child, the minor will have access to the cellphone daily to have telephonic contact with the mother." Thus, the mother could provide phones to her children to ensure she can reach them. Also, given the children's age and the ubiquity of e-mail, social media, and other forms of electronic communication, the mother should have various means of contacting the children if the father were to become unreachable.

III

DISPOSITION

The juvenile court's order is affirmed.


MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


FYBEL, J.

19